**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **DONNA RENEE PORTER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:11cv00017 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | BY: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Donna Renee Porter, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*. (West 2003 & West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Porter protectively filed her applications for DIB and SSI on June 7, 2007, alleging disability as of January 31, 2007, due to strokes, bone deterioration, uncontrolled hypertension, weakness on her right side, swelling of the right shoulder, short-term memory loss and confusion. (Record, ("R."), at 16, 106-11, 136, 174-75.) The claims were denied initially and on reconsideration. (R. at 67-72, 74-79, 80, 81-83, 85-89, 91-92.) Porter then requested a hearing before an ALJ. (R. at 93.) A hearing was held on July 22, 2009, at which Porter was represented by counsel. (R. at 29-60.)

By decision dated September 16, 2009, the ALJ denied Porter's claims. (R. at 16-28.) The ALJ found that Porter met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2011. (R. at 18.) The ALJ also found that Porter had not engaged in substantial gainful activity since January 31, 2007. (R. at 18.) The ALJ determined that the medical evidence established that Porter had severe impairments, namely history of cerebrovascular accidents,("CVA"), hypertension, mild degenerative changes of the cervical spine and right shoulder, type II diabetes mellitus, chronic obstructive pulmonary disease, ("COPD"), and obesity, but she found that Porter's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-21.) The ALJ also found that Porter had

the residual functional capacity to perform light work[1] that required no more than occasionally climbing ramps/stairs, balancing, kneeling, crawling, stooping, crouching and reaching with the right upper extremity and which did not require exposure to temperature extremes, excess humidity, polluted environments and other respiratory irritants and which did not require working around hazardous machinery, working at unprotected heights, climbing ropes/ladders/scaffolds or working on vibrating surfaces. (R. at 21-26.) Thus, the ALJ found that Porter was able to perform her past relevant work as a laundry worker. (R. at 26-27.) Based on Porter's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Porter could perform, including jobs as an interviewer, an information/records clerk and a receptionist/information clerk. (R. at 27-28.) Thus, the ALJ found that Porter was not under a disability as defined under the Act and was not eligible for benefits. (R. at 28.) *See* 20 C.F.R. §§ 404.1520(f),(g) 416.920(f),(g) (2011).

After the ALJ issued her decision, Porter pursued her administrative appeals, (R. at 10-11), but the Appeals Council denied her request for review. (R. at 1-5.) Porter then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Porter's motion for summary judgment filed July 21, 2011, and the Commissioner's motion for summary judgment filed August 23, 2011.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

-3-

## II. Facts[2]

Porter was born in 1960, (R. at 106, 109), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2011). She has a tenth-grade education and past work experience as a high school janitor, a cashier, a line server, a packer and a laundry attendant. (R. at 33-36, 137, 141.) Porter testified that she had suffered four strokes and three mini strokes, the first of which was either in 2003 or 2004, and the last of which was in 2006.[3] (R. at 47.) She stated that she quit working as a janitor in January 2007. (R. at 34.) She noted that she continued to be unable to lift her right arm for long periods of time due to the strokes, and she stated that she had headaches, back problems, hypertension and COPD. (R. at 36, 59.) She stated that her shoulder would swell if she used her right arm too much. (R. at 46.) Porter testified that her right arm problems worsened after the stroke in 2006, noting an inability to hold anything in her right hand. (R. at 47-48.)

Porter testified that she had not undergone any MRIs or x-rays for her back since 2006 or 2007. (R. at 49-50.) She testified that she was diagnosed with COPD in 2007 by Dr. Gary Neal, M.D., for which she took medicine, noting that her inhalers helped sometimes, depending on the weather and the temperature. (R. at 38, 40.) Porter further testified that she had uncontrolled hypertension, for which she took medication, and that testing had revealed no clogged arteries. (R.

---

[2] Because Porter does not challenge the ALJ's finding with regard to her mental residual functional capacity, findings pertaining thereto have been omitted in this Report and Recommendation.

[3] Although the record indicates that Porter reported a history of suffering strokes in July 2003, April 2004 and August 2005, there is no medical documentation that she suffered a stroke in 2006. (R. at 215, 248, 293.)

at 40.) She stated that she also suffered from deteriorating discs in her back, which developed after the 2004 stroke. (R. at 41.) Porter testified that she received cortisone shots every three months, took pain medication and used a doctor-prescribed cane if she was up for a long period of time. (R. at 41.)

Porter testified that she could walk only a short distance before having to stop and rest, that she could stand for about 20 minutes, that sitting bothered her and that she could lift items weighing up to 10 pounds. (R. at 42.) She stated that she had problems using her dominant right hand and difficulty bathing herself because of weakness in her right hand. (R. at 42-43.) However, Porter testified that she performed home exercises to help strengthen her arms. (R. at 44.) She stated that she used a heating pad two to three times daily and had to lie down three times daily for 20 to 30 minutes. (R. at 51.) She described a typical day to include reading her Bible, picking up clothes, watching television and calling her sister. (R. at 44.) She also stated that she attended three church services weekly. (R. at 44.) Porter testified that she continued to work following the 2004 stroke. (R. at 45.)

Anne Marie Cash, a vocational expert, also was present and testified at Porter's hearing. (R. at 54-59.) Cash classified Porter's past work as a janitor, a packer at a chip company, a laundry worker and a line server as light and unskilled, as a packer at a battery company as medium[4] and unskilled and as a cashier, as performed by Porter, as medium and semi-skilled. (R. at 55.) Cash testified that a

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2011).

hypothetical individual of Porter's age, education and work history, who could perform light work that required no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, crawling and reaching with the right dominant upper extremity, that did not require working in extreme temperature changes, around excess humidity, respiratory irritants, hazardous machinery, unprotected heights or vibrating surfaces, and which did not require climbing ladders, ropes or scaffolds, could perform Porter's past work as a laundry worker. (R. at 55-56.) Cash further testified that the same individual also could perform other jobs existing in significant numbers in the national economy, including jobs as an interviewer, an information and records clerk and a receptionist/information clerk. (R. at 57.) Cash was asked to assume the same hypothetical individual, but who could lift items weighing up to only 10 pounds, had to lie down several times daily and was off task 30 to 40 percent of the time. (R. at 58.) She testified that such an individual could perform no jobs. (R. at 58.) Likewise, Cash testified that an individual who could not use the right dominant arm 50 percent of the day could perform no jobs. (R. at 58-59.)

In rendering her decision, the ALJ reviewed records from Dr. Karl W. Konrad, Ph.D., M.D.; Highlands Physicians for Women; Wellmont Bristol Regional Medical Center; Carilion Consolidated Laboratory; Med Express; Louis Perrott, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Outpatient Diagnostic Center at Sapling Grove; Seasons of Abingdon; Dr. Joseph Duckwall, M.D., a state agency physician; and Howard Leizer, Ph.D., a state agency psychologist. Porter's counsel submitted records

from Dr. Gary Neal, M.D., to the Appeals Council.[5]

On August 9, 2004, Porter saw Dr. Karl W. Konrad, Ph.D., M.D., for a physical examination. (R. at 215-17.) Porter reported having experienced a stroke in July 2003 and another in April 2004. (R. at 215.) Porter complained of residual right-sided weakness. (R. at 215.) Dr. Konrad reviewed Porter's medical records, which indicated that her right-sided weakness and clumsiness "improved dramatically." (R. at 215.) Dr. Konrad opined that Porter did not fully cooperate during the examination. (R. at 215.) Physical examination showed full range of motion in all joints, full range of motion of the neck, full range of motion of the back with negative straight leg raise testing, full grip in the palm, normal dexterity in thumb-finger opposition and in self dressing and normal finger-nose coordination and finger tracking. (R. at 216.) Although Porter had a cane with her, she could walk without it, but with an exaggerated limp of the right leg. (R. at 216.) Porter had 5/5 grip strength and 5/5 strength in all extremities. (R. at 216.) Dr. Konrad noted that, while Porter initially held her right arm flexed close to her body, stating it was weak and that she could not move it, she subsequently used it normally to position herself as she shifted from sitting to lying and back again and as she got off the examination table. (R. at 216.) Porter's right arm movements were spontaneous and normal in appearance. (R. at 216.) Her reflexes were -1 and symmetrical. (R. at 216.) Sensation was intact throughout to pin prick, vibration and light touch, and no sensory radiculopathy or peripheral neuropathy was detected. (R. at 216.) Dr. Konrad noted that Porter had experienced a "dramatic

---

[5] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-5), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-7-

recovery of function" from the April 2004 stroke and that Porter had no specific signs of a previous cerebrovascular accident.  (R. at 217.)

When Porter presented to Med Express for a physical on January 16, 2006, she complained of right shoulder pain and right-sided weakness.  (R. at 364-66.)  Her grip strength was 3/5 on the right.  (R. at 365.)  Porter was admitted to Bristol Regional Medical Center, ("BRMC"), on September 7, 2006, with complaints of chest pain and shortness of breath.  (R. at 293-95.)  She had 4/5 strength in both the right upper and right lower extremities.  (R. at 294.)  When Porter presented to Med Express on February 22, 2007, she exhibited right-sided neck tenderness.  (R. at 358.)  Linda Davidson, a family nurse practitioner, diagnosed hypertension, chronic pain syndrome of the neck and back and a sprained right ankle, and she prescribed Lorazepam and Lortab.  (R. at 358.)  Porter was admitted to BRMC on March 23, 2007, for hypertensive urgency with a systolic blood pressure reading in excess of 200, headache and chest tightness.  (R. at 246-81.)  She reported a history of strokes, with the most recent being in August 2005.[6]  (R. at 248.)  An EKG showed nonspecific ST-T changes, and a chest x-ray showed questionable early congestive heart failure.  (R. at 251.)  Porter's blood pressure medications were adjusted, and Norvasc and Lasix were added.  (R. at 246.)  A sleep study was recommended to rule out sleep apnea as a secondary cause of hypertension.  (R. at 246-47.)  Porter had improved significantly at discharge on March 26, 2007, with a blood pressure reading of 126/84.  (R. at 247.)  Porter returned to Med Express on April 3, 2007, for a follow-up from her hospitalization.  (R. at 357.)  Davidson diagnosed Porter with hypertension and hypokalemia, and lab work was ordered.

---

[6] There are no medical records contained in the record on appeal documenting any immediate diagnosis and treatment of Porter's strokes.

-8-

(R. at 357.) Porter was admitted to BRMC for a sleep study on April 5, 2007. (R. at 238-44.) The test showed no obstructive sleep apnea, but she awoke frequently throughout the night. (R. at 243.) Sleep behavior modification techniques were recommended. (R. at 243-44.)

Porter returned to Med Express on April 11, 2007, with complaints of increased weakness on the right side and pain in the right shoulder to the back of the neck. (R. at 356.) She reported dropping things with her right hand. (R. at 356.) Porter was tender to the right shoulder and neck. (R. at 356.) Davidson diagnosed right shoulder and neck pain and ordered x-rays of the right shoulder and cervical spine. (R. at 356.) The x-rays of Porter's right shoulder, taken the same day, showed mild degenerative change with no acute abnormalities. (R. at 235.) The x-rays of Porter's cervical spine showed no acute osseous abnormalities. (R. at 236.) On May 8, 2007, Porter again saw Davidson, reporting continued neck pain that radiated into her right arm, as well as right arm numbness. (R. at 354.) Davidson diagnosed cervical pain with right hand numbness and hypokalemia, and she scheduled an MRI of the cervical spine. (R. at 354.) On June 11, 2007, Porter reported left leg weakness and falling easily. (R. at 353.) Davidson diagnosed chronic back pain, anxiety/depression, overactive bladder and hypertension, and she prescribed Albuterol. (R. at 353.) An MRI of the cervical spine dated June 15, 2007, showed very mild degenerative changes, most prominent at the C3-C4 level with some mild osteophyte and foraminal narrowing and at the C5-C6 level with mild right-sided foraminal narrowing. (R. at 230-32.) No significant canal stenosis was noted. (R. at 232.) Porter returned to Med Express on July 10, 2007, with continued complaints of right shoulder, neck and back pain. (R. at 352.) Porter's diagnoses remained unchanged, and she was encouraged to begin physical

-9-

therapy.  (R. at 352.)  On July 18, 2007, Porter requested a referral for physical therapy, which was provided.[7]  (R. at 351.)

Porter again presented to BRMC on August 10, 2007, with complaints of elevated blood pressure and headache with nausea and vomiting.  (R. at 465-77.) A CT scan of the brain revealed atrophic change and old infarcta, but no focal/acute abnormality or interval change was noted from comparison with an earlier study.  (R. at 476.)  Porter was prescribed Lortab and  Robaxin, and she was discharged in improved condition.  (R. at 466.)  Porter again presented to BRMC on September 24, 2007, with complaints of elevated blood pressure, chest pain and headache.  (R. at 451-63.)  A CT scan of the brain showed a small lacunar infarct in the region of the caudate nucleus and basal ganglion on the right, which was unchanged from a previous study.  (R. at 460.)  There was no evidence of major vascular territory infarct, there was no evidence of intracranial mass or mass effect or evidence of intracranial hemorrhage.  (R. at 460.)  There also was an old lacunar infarct in the brain stem on the left, which was unchanged from a previous study. (R. at 460.)  Porter was discharged the same day with prescriptions for clonidine and Lortab.  (R. at 456.)

Porter returned to BRMC on October 1, 2007, with complaints of having had a seizure, followed by onset of headache and nausea.  (R. at 433-49.)  A chest x-ray was normal, and a CT scan of the brain revealed no change from previous studies.  (R. at 445, 447.)  Porter was diagnosed with a vasovagal event.  (R. at 434.)  Thereafter, an EEG dated October 3, 2007, was normal.  (R. at 430.)  Porter

---

[7] There is no evidence in the record that Porter ever engaged in any physical therapy.

-10-

again presented to BRMC on December 26, 2007, with complaints of hurting all over and shortness of breath. (R. at 419-29.) She also complained of a cough, fever and chest pain, worsened with deep breaths. (R. at 419.) Physical examination showed pleuritic chest pain, prolonged expirations and wheezes. (R. at 420.) Porter was diagnosed with an acute asthma exacerbation and influenza. (R. at 420.) She was prescribed prednisone, doxycycline and Lortab. (R. at 424.)

Porter was treated by Dr. Jeffrey McQueary, M.D., a gynecologist, at Seasons of Abingdon from January through September 2008. (R. at 548-94.) Over this time, she was diagnosed with right lower quadrant abdominal pain, left lower quadrant abdominal pain, female stress incontinence, menorrhagia, cystocele, urinary tract infection, influenza, acute asthma exacerbation and dyspareunia. (R. at 548-94.) A February 6, 2008, pelvic ultrasound showed a uterine fibroid and a very small left ovarian cyst. (R. at 587-88.) On March 6, 2008, Dr. McQueary recommended a hysterectomy. (R. at 584.)

Dr. Robert McGuffin, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Porter on March 3, 2008, finding that she could perform light work that required no more than the occasional climbing of ladders, ropes and scaffolds. (R. at 381-88.) Dr. McGuffin imposed no manipulative, visual or communicative limitations, but he found that Porter should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation, as well as hazards, such as machinery and heights, (R. at 384-85.)

Porter underwent a laparoscopic supracervical hysterectomy with vaginal taping and a diagnostic cystoscopy on March 20, 2008. (R. at 392-95.) Her fasting

-11-

blood sugars at that time were 179, and she was advised to follow up with her primary care physician regarding diabetes. (R. at 398-99.) Porter was discharged the following day with prescriptions for Percocet and Cipro. (R. at 398.) When Porter saw Dr. McQueary on April 8, 2008, for a surgical follow-up, she reported contraction-type abdominal pain with mild right lower quadrant tenderness. (R. at 568-69.) He continued Porter on Lortab and advised her to take Motrin for inflammation. (R. at 569.) On May 6, 2008, Porter reported quite a bit of pain in the left lower quadrant. (R. at 566-67.) However, she reported improved low back pain and improved pain around the umbilicus. (R. at 566.) Dr. McQueary diagnosed left lower quadrant abdominal pain and female stress incontinence. (R. at 567.) On June 3, 2008, Porter reported tenderness and a pulling sensation in the vaginal area, as well as thigh cramping. (R. at 564.) Otherwise, Dr. McQueary noted that Porter was doing very well after the hysterectomy. (R. at 564.) He diagnosed periurethral pain, prescribed tramadol and continued Lortab. (R. at 565.) On July 3, 2008, Porter continued to report periurethral pain, which Dr. McQueary believed to be a residual of a tension-free vaginal tape, ("TVT"), that was placed in April 2006, and he advised removal thereof. (R. at 561.) He stated that Porter was doing fairly well, diagnosed periurethral pain and prescribed fluconazole and refilled her Lortab. (R. at 562.) On August 7, 2008, Porter underwent excision of TVT mesh and periurethral adhesiolysis for pain in the right introitus. (R. at 524-25.) She was discharged the same day in stable condition. (R. at 521, 525.)

On July 9, 2008, Porter underwent an MRI of the bilateral temporomandibular joints, ("TMJ"), which showed no definite abnormality on the left, but motion artifact on the right did not allow for adequate evaluation of the

meniscal position. (R. at 479.) However, there did appear to be anterior translation with opening of the mouth. (R. at 479.) On August 8, 2008, Porter's friend called Dr. McQueary's office reporting that Porter was in severe pain, had a swollen neck and could not walk due to hip pain. (R. at 552.) She was advised to take Porter to the emergency room. (R. at 552.) Porter was admitted to the hospital with elevated blood pressure and chest pain. (R. at 482.) Her blood pressure on admission was 220/110. (R. at 482.) She noted her history of stroke with mild residual weakness of the right upper limb. (R. at 483-84.) She also noted right-sided weakness in the past, but stated that she had recovered fairly well. (R. at 483-84.) Physical examination revealed good hand grip. (R. at 484.) A CT pulmonary angiogram was negative for any pulmonary embolus or aortic problems. (R. at 484, 506-07.) A chest x-ray also was normal. (R. at 509.) A magnetic resonance angiography, ("MRA"), of the abdomen showed single bilateral renal arteries without evidence of renal stenosis, but a questionable mild proximal narrowing of the celiac axis versus median arcuate ligament syndrome was noted. (R. at 510-11.) Porter was discharged on August 11, 2008, with diagnoses of hypertensive emergency, atypical chest pain, diabetes mellitus type 2, uncontrolled, chronic back pain, vaginitis and history of previous cerebrovascular accident. (R. at 481-82.) She was advised to perform activity as tolerated, and it was noted that a stress test would be scheduled, (R. at 481.) On August 12, 2008, Porter reported being diagnosed with diabetes. (R. at 550.) On September 2, 2008, she reported that the periurethral pain was feeling better. (R. at 548.) Dr. McQueary diagnosed status-post revision of the TVT with some continuing pain and prescribed Lortab. (R. at 549.)

On November 25, 2008, Dr. Joseph Duckwall, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding

-13-

that Porter could perform light work with an ability to occasionally climb ladders, ropes and scaffolds. (R. at 595-602.) He did not impose any manipulative, visual or communicative limitations, but he found that Porter should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation, as well as hazards, such as heights and machinery. (R. at 598-99.) Porter's statements were deemed partially credible. (R. at 602.)

On August 6, 2009, Dr. Gary W. Neal, M.D., prepared a report in support of gaining prior approval for a cervical MRI. (R. at 630.) Dr. Neal listed Porter's diagnoses as right arm/forearm/hand radicular pain, decreased muscular strength and decreased sensory acuity with onset approximately three months previously. (R. at 630.) Porter reported constant right arm/hand heaviness, weakness, clumsiness and pain involving her upper arm/forearm and the first three fingers of the right hand for the previous three months. (R. at 630.) She reported that the pain was severe, progressive and unrelenting. (R. at 630.) Dr. Neal performed nerve blocks at the C5-C6, C6-C7 and C7-T1 levels of the spine for pain rated as a 10/10 intensity, unrelieved by hydrocodone APAP. (R. at 630.) Dr. Neal stated that Porter, who was right-handed, could not perform activities of daily living such as grooming, cooking and housecleaning since her pain had become continuous. (R. at 630.) He noted a right body CVA in 2003, and he reported that on physical examination that day, Porter had a new sensory nerve impairment over the right thumb, middle and index fingers indicative of cervical radicular impingement. (R. at 630.) Porter had muscle weakness in the right biceps, triceps, forearm extensor and flexor muscles and flexor and extenstor muscles for the first three fingers in comparison to the right fourth and fifth fingers and all fingers of the left hand. (R. at 630.) Porter had hyperreflexia in the right deep tendon reflexes diffusely in her

-14-

arm dating from her right body stroke. (R. at 630.) Dr. Neal stated that he had ordered the cervical MRI to evaluate Porter's new right arm neurologic deficits and pain and that such an MRI had been deemed essential by the ALJ in evaluating her case. (R. at 630.)

Dr. Neal stated that some of Porter's symptoms were first noted intermittently in early 2007 and that x-rays of the neck dated April 2007 showed some "head tilt" to the left, mild disc space narrowing at the C4-C5 level and mild facet disease of the cervical spine. (R. at 630.) He noted that these intermittent symptoms worsened, resulting in an MRI of the cervical spine on June 11, 2007, that showed osteophytic ridges at the C2-C3 level that narrowed the neural foramina, but no impingement of the nerve root was seen. (R. at 630.) At the C3-C4 level, osteophytic complexes narrowed both neural foramina and compressed the left nerve root. (R. at 630.) Osteophytic narrowing also was seen at the C4-C5 level of the spine. (R. at 630.) The right neural foramina at the C5-C6 level was narrowed by an osteophyte, but no neural impingement was seen. (R. at 630.) Mild concentric disc bulging was seen at the C6-C7 level, and minimal disc bulging and osteophyte formation without neural impingement was seen at the C7-T1 level. (R. at 630.) Dr. Neal reported that Porter's right arm symptoms thereafter cleared and then returned as persistent complaints about three months prior to the time of his letter. (R. at 630.)

Porter was again hospitalized from August 12 through August 16, 2009, for chest pain worsened with deep breathing. (R. at 619.) Her glucose was found to be as high as 455. (R. at 619.) A CT angiogram of the heart was negative, and Porter's calcium score was almost zero. (R. at 619.) Porter was given insulin, her

-15-

chest pain resolved and her blood sugars came under control. (R. at 619.)

On January 25, 2010, Dr. Neal completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) of Porter, finding that she could lift/carry items weighing up to 10 pounds occasionally and up to five pounds frequently. (R. at 626-27.) He found that she could stand/walk for a total of one hour in an eight-hour workday, but for only 15 minutes without interruption, and that she could sit for a total of two to three hours in an eight-hour workday, but for only 30 minutes without interruption. (R. at 626.) Dr. Neal found that Porter could never climb, kneel, balance, crouch or crawl, but could occasionally stoop. (R. at 627.) He found that her abilities to reach, to handle, to feel and to push/pull were affected by her impairment and that she was limited in her abilities to work around heights, moving machinery, temperature extremes, chemicals, dust and fumes. (R. at 627.) In support of these findings, Dr. Neal noted Porter's cervical disc disease, lumbosacral disc disease and residuals from her previous stroke.[8]

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant

---

[8] Dr. Neal's handwritten notes stating his reasons for his findings are in large part illegible.

-16-

work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1250(a), 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003, West 2011 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

-17-

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

Porter first argues that the Appeals Council erred in declining to consider the report and opinions of Dr. Neal. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7.) She also argues that there was a reasonable possibility that the additional evidence submitted to the Appeals Council from Dr. Neal could have changed the ALJ's decision. (Plaintiff's Brief at 8-9.) Finally, Porter argues that the Appeals Council erred by failing to sufficiently state its reasons for declining review of the ALJ's decision. (Plaintiff's Brief at 10-13.) For all of the following reasons, I find these arguments unpersuasive.

First, Porter's contention that the Appeals Council did not consider the evidence from Dr. Neal is simply incorrect. The Appeals Council did consider this evidence in declining to review the ALJ's decision. (R. at 1-5.) That being the case, this court also must consider this evidence in determining whether substantial evidence supports the ALJ's decision. *See Wilkins*, 953 F.2d at 96. The ALJ found that Porter had the residual functional capacity to perform light work that did not require more than occasional climbing of ramps/stairs, balancing, kneeling,

-18-

crawling, stooping, crouching and reaching with the right upper extremity and which did not require exposure to temperature extremes, excess humidity, pollutants and other respiratory irritants and which did not require work around hazardous machinery, unprotected heights, climbing ropes/ladders/scaffolds or work on vibrating surfaces. (R. at 21-26.) In arriving at this conclusion, the ALJ considered, among other things, Porter's right hand problems, noting that, while she had evidenced a decrease in grip strength on occasion, there was no evidence that she had been diagnosed with any impairment involving her hand or that she had reported other chronic symptoms. (R. at 19.) The ALJ further noted Porter's testimony that she had not had any specialized treatment for her hand difficulties since 2005. (R. at 19.) The ALJ also noted negative testing for sleep apnea, sporadic female stress incontinence and abdominal and pelvic pain, which responded fairly well to treatment, and pain due to possible TMJ disorder, but for which no aggressive treatment had been recommended. (R. at 19.)

More specifically, with regard to her right-sided weakness and right arm difficulties, the ALJ found that the medical evidence established a dramatic improvement in Porter's right-sided weakness and clumsiness almost immediately following the 2004 stroke. (R. at 22-23.) The ALJ based this finding on Dr. Konrad's August 2004 examination showing full grip strength in Porter's palm, normal dexterity in thumb-finger opposition and in self dressing, normal finger-nose coordination, normal finger tracking, 5/5 strength in upper and lower extremities, normal grip strength and a blood pressure reading of 127/93. (R. at 23.) The ALJ further noted that, while Porter took a cane to this examination, she could walk without it and had an exaggerated limp of the right leg. (R. at 23.) Additionally, the ALJ noted that, at this examination, despite Porter's contention

-19-

that she could not use her right arm due to weakness, she was able to use it normally to position her body, and her arm movements appeared normal. (R. at 23.) Lastly, the ALJ noted Dr. Konrad's assessment that Porter had no specific signs of a previous CVA. (R. at 23.)

In addition to the ALJ's findings, the court notes that Porter returned to work as a school janitor following the strokes and continued working until January 2007. Furthermore, after July 2007, there are no complaints of weakness or pain in the right arm until more than a year later, in August 2008, when she reported only mild weakness therein. (R. at 483-84.) Nonetheless, the examining physician found "good hand grip." (R. at 484.) No further treatment is reflected in the record until August 2009 when Porter was hospitalized for chest pain and hyperglycemia. (R. at 619-20.) However, Porter voiced no complaints regarding her right arm at that time. (R. at 619-20.)

As the Commissioner states in his brief, the ALJ accounted for any right hand impairment by limiting Porter to only occasional reaching with the right upper extremity. (R. at 21.) Also as noted by the Commissioner, such a limitation accounted for Porter's claims that she had difficulty reaching, was unable to use the right arm for long periods of time and that she could not use the right hand very much. (R. at 43.) I further note Porter's Function Report completed in August 2007 in which she stated that she washed laundry, ironed clothing, prepared food for her 12-year-old and attended church services three times weekly. (R. at 147-54.) Such activities are inconsistent with Porter's allegations of disabling right arm difficulties.

In addition to Porter's right arm weakness, the ALJ also thoroughly considered her hypertension, COPD, neck pain and right shoulder pain. (R. at 23-24.) In particular, the ALJ noted that, after medication adjustments in March 2007, Porter's hypertension came under control and remained relatively stable through July 2007. (R. at 23.) While Porter presented to the emergency room on various occasions from 2007 through 2009 for elevated blood pressure, chest pain and occasional headaches, testing consistently revealed no abnormalities or changes when compared with previous studies. (R. at 23.)

Next, the ALJ considered Porter's type II diabetes mellitus resulting from elevated blood sugars. (R. at 23.) Although she was placed on medication, her diabetes remained uncontrolled. (R. at 23.) After visiting the emergency room and being placed on insulin in August 2009, Porter's blood sugar was better controlled. (R. at 23.) The ALJ also discussed Porter's asthma/COPD, stating that she had been prescribed an inhaler, but chest x-rays and an angiogram showed no evidence suggestive of an acute pulmonary embolism. (R. at 23.) Additionally, at office visits through 2008, Porter did not complain of wheezing, dyspnea upon exertion, confusion, dizziness or weakness. (R. at 23.) In fact, the ALJ noted that Porter's physical examinations revealed that her lungs were clear to auscultation bilaterally, and there was no wheezing, rales or rhonchi. (R. at 23.) Also, at her last emergency room visit in August 2009, Porter's breathing impairment was deemed under control. (R. at 23.)

Next, the ALJ considered Porter's chronic neck pain and arm numbness, which caused her to drop things, noting that, prior to the alleged onset date, an x-

ray showed only mild degenerative changes.[9] (R. at 24.) After being prescribed pain medication, she described her pain as a zero on a 10-point scale, and she reported being able to perform activities of daily living. (R. at 24.) Furthermore, physical examination showed tenderness in the neck and back along with decreased grip strength in the right arm. (R. at 24.) However, Porter was continued on pain medication, and a June 2007 MRI of the cervical spine showed very mild degenerative changes. (R. at 24.) Although Porter was referred for physical therapy, there is no indication in the record that she ever followed through. (R. at 24.) Lastly, an August 2009 MRI of Porter's neck revealed very minimal disc desiccation of the intervertebral discs with some straightening of the cervical lordosis, but otherwise was unremarkable. (R. at 24.)

Although the state agency physicians found that Porter could perform light work limited only by an ability to occasionally climb ladders/ropes/scaffolds and the need to avoid concentrated exposure to respiratory irritants and workplace hazards, the ALJ gave Porter the benefit of the doubt in imposing additional restrictions in her residual functional capacity finding, which appropriately accounted for all of Porter's limitations supported by the record. (R. at 24.)

Porter next argues that the Appeals Council erred by denying review because there was a reasonable possibility that the evidence submitted from Dr. Neal could have changed the ALJ's decision. (Plaintiff's Brief at 8-9.) Again, I am not persuaded by Porter's argument. Porter argues that this evidence supports her

---

[9] Although the ALJ referenced this x-ray as being performed prior to Porter's alleged onset date, it actually was performed in April 2007, approximately two months after the alleged onset date. (R. at 235.)

Case 1:11-cv-00017-JPJ-PMS   Document 18   Filed 02/24/12   Page 22 of 27   Pageid#: 716

allegations regarding the residuals of her stroke and the severity of her right hand and arm impairment. As stated above, where the Appeals Council considers additional evidence, this court must consider the entire record, including the new evidence, in order to determine whether substantial evidence supports the ALJ's decision. *See Wilkins*, 953 F.2d at 96. That being said, the ALJ's decision will be affirmed if substantial evidence supports it based on such a review of the entire record. After reviewing the record as a whole, I find that substantial evidence supports the ALJ's findings regarding Porter's right arm impairment and its effect on her work-related abilities. In particular, in his August 6, 2009, letter, Dr. Neal noted that the onset of Porter's symptoms was approximately only three months previously. (R. at 630.) Also, Dr. Neal reported that, while Porter had experienced intermittent right arm symptoms in 2007, these had cleared up until three months previously. (R. at 630.) As discussed herein, after July 2007, there was little evidence regarding ongoing problems with Porter's right arm. In August 2008, while Porter complained of only mild right arm weakness, examination revealed good hand grip. (R. at 483-84.) After that, Porter underwent no treatment until August 2009 for chest pain and hyperglycemia, at which time she voiced no complaints regarding her right arm. (R. at 619-20.) Additionally, as the Commissioner notes, this August 6, 2009, letter was merely an addendum in support of Dr. Neal's request for an MRI of Porter's cervical spine. (R. at 630.) This MRI was performed on August 12, 2009, and the ALJ had this evidence before him at the time of his decision. (R. at 617-18.) The results of this MRI showed only very minimal desiccation of the intervertebral discs with some straightening of the normal cervical lordosis. (R. at 618.) It was, otherwise, unremarkable. (R. at 618.) Moreover, also as noted by the Commissioner, when Porter was hospitalized for chest pain and hyperglycemia the same day the MRI

-23-

was performed, she voiced no complaints regarding her right arm.  (R. at 619-20.)

Next, I find that the physical assessment completed by Dr. Neal on January 25, 2010, more than four months after the ALJ's decision, does not relate the findings contained therein to the relevant time period.  Additionally, a claimant's residual functional capacity is an issue reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2011).  Dr. Neal opined that Porter could lift/carry items weighing up to 10 pounds occasionally and up to five pounds frequently, that she could stand/walk for a total of only one hour in an eight-hour workday, but for only 15 minutes without interruption, that she could sit for a total of two to three hours in an eight-hour workday, but for only 30 minutes without interruption, that she could occasionally stoop, but never climb, kneel, balance, crouch or crawl, that her abilities to reach, to handle, to feel and to push and/or pull were affected by her impairment and that she should not work around heights, moving machinery, temperature extremes, chemicals, dust or fumes. (R. at 626-27.)  I first note that there are no treatment notes from Dr. Neal contained in the record. Additionally, no other medical records support the severe physical limitations found by Dr. Neal.

It is for all of these reasons that I find that substantial evidence supports the ALJ's findings when considering the whole record, including the records from Dr. Neal.

Lastly, I find unpersuasive Porter's argument that her claims should be remanded for the Appeals Council's failure to provide an adequate explanation for declining review. (Plaintiff's Brief at 10-13.)  In its Notice Of Appeals Council

Action, the Appeals Council stated "we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the [ALJ's] decision." (R. at 1-4.) The Fourth Circuit recently held that "nothing in the Social Security Act or regulations promulgated pursuant to it requires that the Appeals Council explain its rationale for denying review." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011). The Fourth Circuit found that the Appeals Council's denial of a request for review differs sharply from an ALJ's decision. *See Meyer*, 662 F.3d at 705. While the Social Security regulations explicitly require the ALJ to issue decisions supported by findings of fact and the reasons for the decision, the regulations do not require the Appeals Council to articulate its rationale for denying a request for review. *See Meyer*, 662 F.3d at 705 (citing 20 C.F.R. § 404.953(a)). The Fourth Circuit clarified that "[o]nly if the Appeals Council *grants* a request for review and issues its own decision on the merits is the Appeals Council required to make findings of fact and explain its reasoning." *Meyer*, 662 F.3d at 706 (citing 20 C.F.R. §§ 404.979, 404.1527(f)(3)).

It is for all of these reasons that I find unpersuasive Porter's argument that the Appeals Council erred by failing to adequately explain its decision not to grant review.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

-25-

1. Substantial evidence exists to support the Commissioner's residual functional capacity finding;

2. The Appeals Council's statement that it was not granting review of the the ALJ's decision was sufficient; and

3. Substantial evidence exists to support the Commissioner's finding that Porter was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Porter's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

-26-

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    February 24, 2012.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE
